**[Cite as *In re C.R.*, 2021-Ohio-1969.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.R.

Court of Appeals No.  L-20-1195

Trial Court No.  JC 19276873

**DECISION AND JUDGMENT**

Decided:  June 10, 2021

* * * * *

Michael H. Stahl, for appellant.

Janna E. Waltz, for appellee.

* * * * *

**ZMUDA, P.J.**

## I.    Introduction

{¶ 1}  Appellant, S.R. ("mother"), appeals the judgment of the Lucas County

Court of Common Pleas, Juvenile Division, granting a motion for permanent custody

filed by appellee, Lucas County Children Services ("LCCS"), thereby terminating her parental rights with respect to her minor child, C.R.[1]  Finding no error below, we affirm.

## A.    Facts and Procedural Background

{¶ 2}   In September 2019, LCCS received a referral alleging that mother had missed several medical appointments for C.R.  The matter was assigned to a caseworker, Samantha Troiano, who investigated the allegations.  Troiano visited mother's residence on September 18, 2019, at which point she interviewed mother to determine the validity of the allegations that mother was not caring for C.R.'s medical needs.  Ultimately, LCCS determined that mother had, in fact, taken C.R. to her medical appointments.  However, during Troiano's September 18, 2019 visit, mother refused to answer questions, and became hostile.  According to Troiano, mother told her and her supervisor that "she was going to blow up our agency so it would burn so we could die a slow death."  Because of this threat, mother was arrested and charged with one count of making terroristic threats in violation of R.C. 2909.23(A)(1)(b).[2]

{¶ 3}   One week later, on September 25, 2019, the juvenile court held a shelter care hearing, at which mother consented to C.R.'s placement in the interim temporary

---

[1] C.R.'s father did not file a notice of appeal challenging the judgment of the juvenile court, and he is therefore not a party to this appeal.
[2] On November 8, 2019, mother entered a plea of no contest to the amended charge of inducing panic in violation of R.C. 2917.31.  The trial court accepted mother's plea, found her guilty, and immediately sentenced her to 180 days in jail, 180 days suspended.  Mother was then placed on probation for a period of one year.

2.

custody of LCCS. Thereafter, on November 4, 2019, the matter proceeded to a disposition hearing.

{¶ 4} During the disposition hearing, Troiano testified that LCCS has a history with mother. Troiano explained that mother had two children prior to C.R., one of whom was placed into LCCS's permanent custody due to mother's mental health and parenting issues. Troiano also indicated that mother threatened her during her initial visit to mother's home. According to Troiano,

{¶ 5} At the conclusion of the disposition hearing, the juvenile court found C.R. to be dependent. As a result of its dependency determination, the court granted temporary custody of C.R. to LCCS. Mother did not appeal the juvenile court's dependency determination or its grant of temporary custody to LCCS.

{¶ 6} Eight months later, on July 6, 2020, LCCS filed a motion for permanent custody, in which it argued that C.R. could not be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a), and the permanent custody is in C.R.'s best interest under R.C. 2151.414(D)(1). LCCS further contended that mother continuously and repeatedly failed to remedy the condition, namely her chronic mental health illness, which led to C.R.'s removal from the home, and noted that mother previously had her parental rights involuntarily terminated with respect to C.R.'s older sibling.

3.

{¶ 7} The matter proceeded to trial on LCCS's motion for permanent custody on October 30, 2020. During the trial, the LCCS caseworker assigned to this case, Da'Nelle Flowers, testified that LCCS established case plan services for mother upon the removal of C.R. from mother's custody. The initial goal of the case plan was reunification of C.R. with mother. The services offered to mother under the case plan consisted of a diagnostic assessment and parenting services.

{¶ 8} According to Flowers, mother completed her first assessment at Unison Behavioral Health. Following the assessment, Unison diagnosed mother with oppositional defiant disorder, mixed obsessional thoughts and acts, unspecified personality disorder, and unspecified bipolar and related disorder. Given this diagnosis, mother was referred to adult day treatment at LCCS in order to improve her interpersonal and social skills, improve her problem solving skills, and learn positive coping and self-management skills. She was also offered psychiatric services. While she agreed to attend adult day treatment classes, mother declined psychiatric services, insisting that she did not need them.

{¶ 9} After a follow-up assessment, mother signed a release to enable LCCS to receive limited information from Unison, but later revoked the release, making it difficult for LCCS to obtain information relevant to mother's case. Mother consistently participated over the course of several months participated in adult day treatment services, but failed to progress in such services. She maintained that she no longer had

4.

custody of C.R. due to animosity from LCCS and she refused to acknowledge any concerns with her parenting. At trial, Flowers testified that mother refused to accept responsibility for the reasons surrounding C.R.'s removal.

{¶ 10} On September 26, 2019, within days of completing her first assessment at Unison, mother underwent a second diagnostic assessment at the Zepf Center. Mother was reportedly "guarded and vague regarding her responses" to questions. Following the assessment, mother was diagnosed with unspecified depressive disorder and referred for mental health services and a psychiatric evaluation. Flowers testified that mother did not complete mental health services, but she returned one month later for the recommended psychiatric evaluation. Mother did not sign a release to enable LCCS to receive the result of the evaluation, which included a diagnosis of unspecified depressive disorder and a statement that mother did not believe she needed any medications, declined therapy, wanted her case closed, and did not plan to make any other appointments.

{¶ 11} During the course of her assessment, mother reported that she was living with three daughters and a "significant other." Flowers expressed concern about mother's representations. First, Flowers pointed out that mother was not living with any of her children at the time of the assessment, and noted that mother's two prior children had not lived with mother "for many years" at that point. Second, Flowers indicated that LCCS was concerned about mother residing with someone else, because mother did not provide any information on this person.

5.

{¶ 12} One day after her second assessment, mother underwent a third assessment, this time at Harbor Behavioral Health. Like the second assessment, this assessment was not sanctioned by LCCS, and Flowers testified at trial that the agency had no knowledge of the assessment because mother did not sign a release for LCCS to receive the results from the assessment. In her third assessment, mother was diagnosed with obsessive compulsive personality disorder and referred for counseling services. Mother did not engage in the recommended counseling services.

{¶ 13} At trial, Flowers expressed concerns with the fact that mother reported conflicting and inaccurate information in each of her three assessments. For example, mother told Harbor that she needed an assessment in order to prove her mental fitness in a custody dispute with her children's fathers. Mother also reported concerns that her children would be placed into the custody of their fathers at the psychiatric evaluation she underwent at the Zepf Center, and made the same statements during a psychiatric evaluation at Unison. However, no such custody proceedings were pending at the time of her assessment, and mother failed to inform her mental health provider that all three of her children had already been removed from her custody at the time of the evaluation. Moreover, mother stated at the evaluation that she never lost custody of her children, and indicated that she "lives with her children in her own house." Additionally, mother informed the Zepf Center that she had no history of mental health issues and was never prescribed medications for said mental health issues, neither of which was accurate.

6.

{¶ 14} Asked about any reservations regarding C.R.'s reunification with mother, Flowers voiced her concerns with mother's ongoing mental health issues. She testified that mother was still struggling with the same significant mental health issues that necessitated the termination of her parental rights over one of her prior children in 2012. Consequently, Flowers opined that mother is unable to presently provide C.R. with a safe, stable, and permanent environment. Moreover, Flowers was doubtful as to mother's ability to improve her mental health situation given her sustained mental health issues and her refusal to address such issues.

{¶ 15} During the pendency of these proceedings, mother began seeing a psychologist, Dr. Robert Closs. During the trial, Closs relayed that he diagnosed mother with Obsessive Compulsive Personality Disorder and Adjustment Disorder with symptoms of mixed emotions and conduct, which he described as "a standard type of disturbance that any normal individual might experience under stressful-like life circumstances." In Closs's opinion, the custody issues surrounding C.R. led to mother's adjustment disorder.

{¶ 16} Closs expressed his concern that other mental health professionals might have "overdiagnosed [mother] on the basis of her oppositional behavior and her defiance as opposed to diagnosing her on mental health criteria." Closs described mother as a "very honest person," and insisted that mother's mental health diagnoses would not affect her ability to effectively parent C.R. On cross-examination, Cross acknowledged that he

7.

did not review the representations made by mother during her mental health assessments with Unison, Harbor, and the Zepf Center, and agreed that those representations were not entirely truthful. Nonetheless, Closs persisted in his conclusion that mother's mental health issues were not serious enough to warrant a grant of permanent custody of C.R. to LCCS. When asked about the contrary conclusions reached by the other mental health professionals who assessed mother in connection with this case, Closs testified that such contrary conclusions were the product of a failure to objectively test mother as he had done.

{¶ 17} Concerning mother's participation in parenting services under the case plan, Flowers stated that LCCS was unable to refer her for the parenting services due to the lack of progress she made in her mental health services. Nonetheless, mother completed a parenting program on her own. Flowers testified that mother signed a release for LCCS regarding her parenting program, but limited the release in such a way that it made it difficult for LCCS to obtain the information they needed. Similarly, C.R.'s guardian ad litem, John Wenzlick, testified of difficulties obtaining information related to mother, and reported that mother rescinded some of the releases before he could get the necessary information.

{¶ 18} While mother participated in parenting services generally, Flowers stated that the parenting program completed by mother did not satisfy the parenting services under the case plan, because the program did not include parent, child observations and it

8.

was not an interactive parenting program. During mother's visitations with C.R., Flowers observed mother's "very rough" burping of C.R. following feedings, and expressed general concerns about mother's handling of C.R. at trial. Similarly, LCCS Visitation Department supervisor, Linda Rosenbloom, described mother as "aggressive" and "very forceful" toward C.R. during supervised visits. Wenzlick voiced the same concern concerning mother's handling of C.R., but was more tempered in his view and described mother as "a little rough when she would handle [C.R.]."

{¶ 19} As Flowers continued in her testimony, she opined that C.R. was doing "really well" in foster care, and she stated that C.R. appears to be bonding well to her foster family. According to Flowers, the foster parents are willing to adopt C.R.

{¶ 20} At the conclusion of her testimony, Flowers explained that LCCS sought permanent custody of C.R. due to mother's lack of progress toward improving her mental health, mother's failure to complete her case plan services, and C.R.'s success in foster care. Relatedly, Wenzlick testified that he does not believe that mother is capable of providing a safe, stable, and permanent home for C.R. due to mother's ongoing mental health issues and her apparent reluctance to continue with the mental health treatment that is required to address such issues. Asked whether he believed mother could make enough progress in her case plan to change his recommendation if she were given enough time to do so, Wenzlick responded, "unfortunately, no." Therefore, Wenzlick concluded that an award of permanent custody of C.R. to LCCS was in C.R.'s best interest.

9.

**{¶ 21}** Upon hearing the evidence presented by the parties at the trial, the juvenile court permitted the parties to make closing statements. During mother's closing statement, her counsel asked the juvenile court for a six-month extension during which mother would be "given the ability to prove herself that she has changed." The court denied mother's request for an extension, stating:

> I would actually consider the extension if I had a little more faith in Dr. Close – * * * in his familiarity with the whole case. Mom's had long-term mental health issues that go back – I think I read since she was 12. * * * When I read the exhibits, when I hear the testimony, the recurring theme is that it's more important for her to be right than to make a change. And it even seems more important for her to be right than to change for her child and for reunification.

**{¶ 22}** Following the trial, the juvenile court issued an 11-page judgment entry, in which it found that C.R. could not be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a) and permanent custody to LCCS was in C.R.'s best interest under R.C. 2151.414(D)(1).

**{¶ 23}** In support of its finding that C.R. could not be placed with mother within a reasonable time or should not be placed with mother, the juvenile court examined the relevant evidence and found several factors under R.C. 2151.414(E) to be applicable. Under R.C. 2151.414(E)(1), the court found that mother failed to make significant

10.

progress in her case plan services despite reasonable case planning and diligent efforts by LCCS to assist mother in remedying the problems that caused C.R.'s initial placement outside mother's home. The court also concluded that mother's chronic mental illness, which she has refused to address, renders her unable to provide a permanent home for C.R. within one year, as set forth in R.C. 2151.414(E)(2). Under R.C. 2151.414(E)(4), the juvenile court found that mother has demonstrated a lack of commitment toward C.R. by choosing "to 'be right' over making the necessary changes to reunite with her child." Finally, the court noted that mother has previously had her parental rights involuntarily terminated with respect to C.R.'s older sister, and found that mother has failed to prove that she can provide a legally secure permanent placement for C.R. notwithstanding the prior termination under R.C. 2151.414(E)(11).

{¶ 24} In support of its best interests determination under R.C. 2151.414(D)(1), the juvenile court found that C.R. is presently placed with foster parents who are meeting her needs and wish to adopt her. The court found that C.R. has been in the temporary custody of one or more public children services agencies for twelve or more months of a consecutive twenty-two-month period, noting that C.R. had been in LCCS's temporary custody for approximately 14 months at the time of its decision. The court went on to conclude that C.R. needed a legally secure permanent placement, and also found that the best interest factor under R.C. 2151.414(D)(1)(e) was applicable since mother previously had her parental rights involuntarily terminated.

11.

**{¶ 25}** Based upon these findings, the juvenile court granted LCCS's motion for permanent custody, and awarded permanent custody of C.R. to the agency. Thereafter, mother filed her timely notice of appeal.

### B. Assignments of Error

**{¶ 26}** On appeal, mother assigns the following errors for our review:

I. The ruling that C.R. was a dependent child was not supported by competent, credible evidence and was contrary to the manifest weight of the evidence.

II. As the mother was under the care of a psychologist, and was engaged in treatment at the time of trial, and because the case plan was disrupted due to the Covid-19 precautions, it was prejudicial error for the Court not to extend time so that a full and fair determination could be made and the failure to do so is a violation of the mother's rights to due process under the Ohio and United States Constitutions.

III. The severing of parental custody in this case is predicated on the words, rather than acts, of the mother; the mother is presently under the care of a licensed psychologist, who was the only witness qualified to evaluate the mother's mental health and who testified to the mother's fitness as a parent, no competent and credible evidence exists to support the

12.

trial court's mental health determinations, making those determinations contrary to the manifest weight of the evidence.

IV. The child was adjudicated "dependent" and expressly not neglected, predicated on the anticipated abuse and neglect due to mental health concerns; the mother's licensed psychologist not only testified on the mother's behalf, but attended the entire trial and all hearings, as such, the mother presented clear and convincing proof that she would be able to provide permanent and adequate care and the court's ruling to the contrary was contrary to the manifest weight of the evidence, and such a ruling and standard imposed was a denial of the mother's due process rights.

As mother's second, third, and fourth assignments of error are interrelated, we will address them together.

## II. Analysis

### A. Dependency Determination

{¶ 27} In her first assignment of error, mother argues that the juvenile court's determination that C.R. is a dependent child was against the manifest weight of the evidence.

{¶ 28} Relevant to the issue raised by mother in her first assignment of error, the Supreme Court of Ohio has held:

13.

An adjudication by a juvenile court that a child is "neglected" or "dependent" as defined in R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a "final order" within the meaning of R.C. 2505.02 and is appealable to the court of appeals pursuant to R.C. 2501.02.

*In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), syllabus. Moreover, "an appeal of an adjudication order of abuse, dependency, or neglect of a child and the award of temporary custody to a children services agency pursuant to R.C. 2151.353(A)(2) must be filed within 30 days from the judgment entry pursuant to App.R. 4." *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 18.

{¶ 29} Here, the juvenile court found C.R. dependent and filed its dispositional order granting temporary custody of C.R. to LCCS on November 4, 2019. The court's entry was a final order that had to be appealed within 30 days. *Id.* However, mother failed to timely appeal the juvenile court's dispositional order. Therefore, the court's decision on dependency became the law of the case, and we lack jurisdiction to consider mother's first assignment of error challenging that decision. *Matter of L.B.J.*, 4th Dist. Lawrence Nos. 17CA2, 17CA3, 2017-Ohio-4416, ¶ 23, citing *In re S.C.*, 189 Ohio App.3d 308, 2010-Ohio-3394, 938 N.E.2d 390, ¶ 35 (4th Dist.), and *In re J.K.*, 4th Dist. Athens No. 09CA20, 2009-Ohio-5391, ¶ 19-20; *see also In re T.K.M.*, 1st Dist. Hamilton

14.

No. C-190020, 2019-Ohio-5076, ¶ 25 ("Once the time for the filing of an appeal had passed, the [dependency] issue was res judicata and father could not challenge the court's finding that the child was dependent and abused."). Accordingly, we dismiss mother's first assignment of error.

### B. Grant of Permanent Custody

{¶ 30} In mother's remaining assignments of error, she argues that the trial court erred in awarding permanent custody of C.R. to LCCS.

{¶ 31} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17.

{¶ 32} As the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly

15.

against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 33} "R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.*, Slip Opinion No. 2020-Ohio-5102, ¶ 18. Relevant here, the juvenile court "must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest." *Id.*

{¶ 34} Here, the juvenile court concluded that permanent custody to LCCS was warranted based on its finding that C.R. could not be placed with mother within a reasonable time or should not be placed with appellants under R.C. 2151.414(B)(1)(a), which provides:

> (B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

16.

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 35} Concerning the determination as to whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, R.C. 2151.414(E) provides, in relevant part:

If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

17.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

18.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 36} In the case sub judice, the juvenile court found that all of the above-referenced factors under R.C. 2151.414(E) were applicable in this case.  Under R.C. 2151.414(E)(1), the court found that mother failed to substantially remedy the conditions, namely her mental health issues, that caused C.R. to be placed outside the home, despite reasonable case planning and diligent efforts by LCCS to help mother to address those conditions.  The court also concluded that mother suffers from a chronic mental illness that renders her unable to provide a permanent home for C.R. within one year under R.C.

19.

2151.414(E)(2). Under R.C. 2151.414(E)(4), the juvenile court found that mother has demonstrated a lack of commitment toward C.R. by choosing "to 'be right' over making the necessary changes to reunite with her child."

{¶ 37} At trial on LCCS's motion for permanent custody, Flowers testified that mother has a long history of mental health issues, dating back to mother's prior termination case several years ago. During the pendency of this case, services were offered to mother to address her mental health issues, but mother was evasive in her engagement in those services. According to Flowers, mother routinely withheld or revoked her consent for mental health providers to discuss their findings with LCCS, making it difficult for LCCS caseworkers to determine whether she was compliant with her case plan services. Flowers also explained that mother circumvented LCCS and obtained several mental health assessments that were not approved by the agency. During these assessments, mother was untruthful with mental health professionals, stating that she was engaging mental health services in connection with a custody dispute with the fathers of her three children rather than honestly reporting the pending termination proceedings as the basis for her assessments.

{¶ 38} According to the evidence presented by LCCS at trial, mother repeatedly denied suffering from mental health issues despite multiple mental health diagnoses from the professionals she engaged. For her part, mother introduced testimony from Close, who testified that mother was capable of parenting C.R. and was overdiagnosed by other

20.

mental health professionals. However, LCCS's cross-examination of Close revealed that Close's assessment of mother was based upon mother's false statements or omissions, and thus the reliability of Close's testimony was significantly diminished.

{¶ 39} The evidence introduced by LCCS at trial establishes that mother suffers from longstanding mental health issues that she refuses to acknowledge and address. Flowers testified that mother failed to complete the mental health component of her case plan services, and was not likely to do so within one year of trial. Moreover, LCCS introduced testimony establishing that mother previously had her parental rights involuntarily terminated with respect to C.R.'s older sister, and both Flowers and Wenzlick testified that mother could not provide a legally secure permanent placement for C.R. under R.C. 2151.414(E)(11). The juvenile court agreed. In light of the record before us, we do not find that the trial court lost its way in making its findings under R.C. 2151.414(E)(1), (2), (4), and (11). Having made those findings, the juvenile court was required to make the R.C. 2151.414(B)(1)(a) finding that C.R. cannot be placed with mother within a reasonable time or should not be placed with mother. R.C. 2151.414(E).

{¶ 40} In her second assignment of error in this appeal, mother argues that the juvenile court should have granted her request for a six month extension so that she could address her mental health issues, rather than prematurely awarding permanent custody of C.R. to LCCS. According to mother, "while there was a case plan in place, the confluence of the coronavirus restrictions and the mother's legitimate mental health

21.

issues delayed the progress significantly. * * * The pervasive effect of the coronavirus pandemic had an impact upon the mother's efforts in seeking treatment."

{¶ 41} Construing mother's verbal request for a six-month extension as a formal motion to extend temporary custody, we review the juvenile court's decision denying that motion for an abuse of discretion as well. *In re C.K.*, 5th Dist. Muskingham No. CT2020-0027, 2020-Ohio-5437, ¶ 21, citing *In re E.T.*, 9th Dist. Summit No. 22720, 2005-Ohio-6087, ¶ 9. An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 42} Having reviewed the record in its entirety, we find that the coronavirus argument raised by mother on appeal is a red herring, as mother's mental health issues predate the coronavirus pandemic by several years and mother did not articulate how the coronavirus impeded her from addressing her mental illness before the juvenile court. Mother fails to articulate how additional time would have made a difference concerning her mental health issues, and we find that she was provided with an ample amount of time during which she should have remedied those issues.

{¶ 43} Further, mother's oral motion was untimely, as a motion to extend temporary custody "implies that the hearing on permanent custody would not go forward." *In re C.K.* at ¶ 37. Here, mother made her request for an extension of time during closing arguments at the conclusion of the permanent custody trial. Given the

22.

untimeliness of the motion and mother's failure to establish that additional time would have resulted in her completion of case plan services and eventual reunification with C.R., we find that the trial court did not abuse its discretion in denying mother's motion to extend temporary custody. Accordingly, appellant's second assignment of error is not well-taken.

{¶ 44} In addition to its determination that C.R. could not be placed with mother within a reasonable time or should not be placed with mother, the juvenile court also found that an award of permanent custody to LCCS was in C.R.'s best interests under R.C. 2151.414(D)(1), which provides, in relevant part:

> (D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> * * *
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

23.

agencies or private child placing agencies for twelve or more months of a
consecutive twenty-two-month period, or the child has been in the
temporary custody of one or more public children services agencies or
private child placing agencies for twelve or more months of a consecutive
twenty-two-month period and, as described in division (D)(1) of section
2151.413 of the Revised Code, the child was previously in the temporary
custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and
whether that type of placement can be achieved without a grant of
permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this
section apply in relation to the parents and child.

{¶ 45} In considering the child's best interest, the juvenile court is not required to
discuss each of the factors under R.C. 2151.414(D)(1)(a) through (e), and the factors
outlined therein are not exhaustive. *In re A.M.*, *supra*, Slip Opinion No. 2020-Ohio-5102,
at ¶ 31. Indeed, "[c]onsideration is all the statute requires." *Id.*

{¶ 46} In support of its best interests determination under R.C. 2151.414(D)(1)(a),
the juvenile court found that C.R. is presently placed with foster parents who are meeting
her needs and wish to adopt her. This finding was based upon Flowers' testimony that
C.R. is doing well in foster care, where she is bonded to her caregivers and foster family.

24.

Under R.C. 2151.414(D)(1)(c), the court noted that C.R. had been in LCCS's temporary custody for more than 12 months at the time of its decision, a finding that is confirmed by the record. Specifically, C.R. was placed in LCCS's interim temporary custody in September 2019, and remained in LCCS custody for more than a year before the trial on LCCS's motion for permanent custody was held in October 2020. The court went on to conclude under R.C. 2151.414(D)(1)(d) that C.R. deserves a legally secure permanent placement, which it found mother could not provide in light of the mental health issues already addressed above. Finally, the court found that the best interest factor under R.C. 2151.414(D)(1)(e) was applicable since mother previously had her parental rights involuntarily terminated, thus triggering the application of R.C. 2151.414(E)(11).

{¶ 47} Given the evidence introduced by LCCS in the trial below, we find that clear and convincing evidence supports the juvenile court's determination that an award of permanent custody to LCCS was in C.R.'s best interests under R.C. 2151.414(D)(1). Having already concluded that the juvenile court did not lose its way in finding that C.R. cannot be placed with mother within a reasonable time or should not be placed with mother under R.C. 2151.414(B)(1)(a), we find that the juvenile court's award of permanent custody to LCCS in this case was not against the manifest weight of the evidence.

{¶ 48} Accordingly, mother's third and fourth assignments of error are not well-taken.

25.

## III.  Conclusion

**{¶ 49}** For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.