[Cite as *In re J.J.*, 2025-Ohio-2618.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

IN RE J.J.

COURT OF APPEALS NO. {48}L-25-00046

TRIAL COURT NO. JC 24298525

**<u>DECISION AND JUDGMENT</u>**

Decided:

* * * * *

Laurel A. Kendall, for appellant.

Misty Goodrick, for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Timothy Johnson ("Father"), appeals the judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating his parental rights and awarding permanent custody of his minor child, J.J., to appellee Lucas County Children

Services ("LCCS").  For the reasons that follow, the juvenile court's judgment is affirmed.

## I. Facts and Procedural Background

{¶ 2} Father is the parent of J.J., born in 2018.  The parental rights of J.J.'s mother ("Mother") were terminated in 2021 by a Michigan court, and she is not a party to this action.

### A.  LCCS's Temporary Custody of J.J.

{¶ 3} On February 15, 2024, LCCS filed a complaint in dependency, abuse, and neglect and requested that the juvenile court grant temporary custody of J.J. to LCCS. LCCS alleged that in January 2024, it received a referral that J.J. was nonverbal and residing with Father who was reported to be delusional.  Specifically, the referral alleged that Father reported that Mother was breaking into Father's car and placing spiders and feces in the vehicle and Mother was breaking into Father's home through the roof and sexually assaulting J.J.  The referral further alleged that Father nailed the doors shut of his home and that he had failed to show for a scheduled psychiatric appointment in March 2023.

{¶ 4} The complaint additionally alleged that LCCS caseworker Brandon Howard initially investigated the referral.  Howard first contacted Father in his home.  Father denied that Mother had actually harmed J.J., and he explained that Mother had instead threatened to harm J.J.  According to the complaint, Father told Howard that Mother was "unofficially" living in the residence located beneath Father's residence, despite the

2.

presence of another family living there, and she was able to enter Father's residence through his floor. The complaint, however, also stated that J.J. appeared to be happy and appropriately cared for on all occasions in which Howard observed him.

{¶ 5} LCCS also alleged that J.J. had been removed from Father and Mother's custody by a Michigan court in 2019 following a complaint by Wayne County Child Protective Services alleging that J.J. was not being properly supervised and that Father was psychotic and manic. During that proceeding, Father underwent a psychological examination and was diagnosed with an adjustment disorder due to the removal of J.J. Later that year, J.J. was returned to Father's custody. Mother's parental rights were terminated in June 2021 by a court in Michigan due to abandonment.

{¶ 6} Next, LCCS alleged that Father had not followed through with various mental health care providers and had cancelled a mental health appointment for that month. Father also failed to appear for a staffing appointment with the agency on February 14, 2024.

{¶ 7} On February 15, 2024, the juvenile court held an emergency shelter care hearing at which Father and Howard testified. The court found that there was probable cause to believe that placement in shelter care was required to protect J.J. from immediate or threatened physical or emotional harm. The court placed J.J. into the interim temporary custody of LCCS while placement with a relative was under investigation. Father was granted visitation with J.J. He was also ordered to undergo a dual diagnostic assessment

3.

and follow all recommendations made as a result of his assessment. And on February 21, 2024, John Welzlick was appointed as guardian ad litem.

{¶ 8} On April 17, 2024, a dispositional hearing was held before a magistrate, who issued an order finding J.J. to be dependent and placing him into the temporary custody of LCCS. The order contained the following findings of fact:

> Father testified that the child had been diagnosed [with] autism, however the medical documents provided by Father show the child was referred for an autism assessment that Father never completed. His reasoning stemmed from hearing Mother threaten him through vents. Father's testimony was unfocused, and at times [inconsistent]/illogical such as to support the concerns raised regarding his [mental health].

Father was granted visitation with J.J. The court approved the case plan, which required Father to obtain a dual diagnostic assessment and follow all recommendations, Father to undergo parenting education, and J.J. to have developmental assessments and follow all recommendations. The goal remained to reunify J.J. with Father.

{¶ 9} Father objected to the magistrate's decision finding dependency as against the manifest weight of the evidence. Following an independent review of the decision, the juvenile court adopted the magistrate's decision and denied Father's objection.

{¶ 10} On October 24, 2024, LCCS filed a motion for an order permanently terminating Father's parental rights and awarding permanent custody of J.J. to LCCS as well as a motion to extend temporary custody pending hearing. In support of its motion, LCCS asserted that Father had not made progress with respect to the mental health conditions that led to the referral, stating that Father had refused to engage in

4.

recommended mental health therapy and continued to exhibit the same concerning behavior that caused J.J. to be removed. LCCS also averred, however, that Father had visited J.J. consistently and that the agency had no concerns as to the visits. As to J.J., LCCS maintained that J.J. had made significant progress in his foster placement.

{¶ 11} On December 9, 2024, Father filed a motion to reunify with J.J., contending that he had completed all case plan services, he had maintained regular ongoing visitation with J.J., and he and J.J. were bonded to one another. Accordingly, Father argued that reunification was in J.J.'s best interests.

### B. Permanent Custody Hearing

{¶ 12} On January 31, 2025, the juvenile court held a hearing on LCCS's motion for permanent custody and Father's motion to reunify. During the hearing, the court heard the testimony of Kaitlin Rudebock, an LCCS caseworker; Aleah Gallegos, a certified nurse practitioner with Harbor; Father; and John Welzlick, J.J.'s guardian ad litem.

*Events Preceding the Complaint*

{¶ 13} In 2019, J.J. and Father resided in Wayne County, Michigan. Wayne County Child Protective Services removed J.J. from the custody of his parents due to concerns for lack of supervision and Father's mental health. As part of that case, Father completed a psychological evaluation and was diagnosed with an adjustment disorder, and J.J. was returned to Father's custody later that year. Mother was not involved in the case, and her parental rights were terminated in 2021 due to her abandonment of J.J.

5.

{¶ 14} Father and J.J. moved to the Toledo area sometime in 2021. Before this case was initiated in 2024, LCCS received at least one referral claiming that J.J. was subjected to emotional abuse by Mother. LCCS closed out that referral in June 2023 and recommended that Father continue the mental health treatment he was receiving from Harbor.

### Father's Mental Health and Case Plan Services

{¶ 15} Rudebock testified regarding the January 2024 referral that led to LCCS's involvement in this case, which contained allegations that Father had delusions regarding Mother. Rudebock stated that LCCS caseworker Brandon Howard initially investigated the referral, and Rudebock was the ongoing LCCS caseworker who worked with the family on their case plan services. The case plan required Father to undergo a dual assessment and to follow all resulting recommendations, domestic violence services, and parenting education.

{¶ 16} To that end, Rudebock testified that a provider at Harbor completed a dual assessment of Father in April 2024. At that appointment, Father reported that Mother was initiating the referrals to LCCS and that Mother continued to stalk and harass him to get custody of J.J. Father was diagnosed with adjustment disorder with mixed emotional and conduct disturbances and recommended that Father continue counseling if he so chose.

{¶ 17} After Rudebock reviewed Father's assessment, she contacted Harbor to determine if the Harbor provider had reviewed LCCS's referral regarding Father before

6.

conducting the assessment. Father's records from Harbor reflect that Rudebock reported that Father "is making statements that ex-girlfriend is coming into his house through the refrigerator, his son's tablet, and lifting the roof of the house." In addition, Rudebock reported that Father said that Mother had come into the house and stabbed him on the back of his leg.

{¶ 18} After determining that the referral had not been reviewed, a second dual assessment of Father was completed in May 2024. The second dual assessment recommended that Father undergo a mental health psychiatric evaluation and pharmacological management. The second dual assessment also included a "rule out" diagnosis of a delusional disorder.

{¶ 19} Gallegos, a nurse practitioner with Harbor, conducted the psychiatric evaluation of Father in July 2024. Her notes characterize Father's speech as hyperverbal and pressured and his thought processes as disorganized and racing, and she observed that he struggled with perseveration of his thoughts. She also noted that Father had beliefs of persecution, was distractible, his associations were tangential, and he suffered from delusions. Specifically, she observed that Father appeared to be obsessed with the idea that Mother, Mother's male friend, and Rudebock were "all working together to ensure he loses custody of his son." Gallegos noted that Father accused Mother of breaking into his car using a spare key, of which Mother still had possession. Gallegos testified that she found Father's hyperverbal speech pattern and tangential thoughts to be concerning and suspected he was experiencing delusions relating to Mother.

7.

{¶ 20} Gallegos recommended that Father possibly take medication "to assist with the tangential statements and racing thoughts," but Father declined, explaining that he had "'spent a lot of time in Germany and people talk faster there [because they] process language faster than those from the Midwest.'" Gallegos also recommended that he continue to receive treatment from her, but Father declined because he did not "'want to take [her] time away from those that really have mental health issues.'"

{¶ 21} Based on her assessment, Gallegos diagnosed Father with an adjustment disorder and maintained a "rule out" diagnosis of delusional disorder. Gallegos testified that a rule-out diagnosis means that Father exhibited signs of the disorder but that she needed additional time with Father to positively diagnose him. Because Father declined further treatment with Gallegos, she was unable to rule out a delusional disorder. Gallegos testified that Father did reach out to her once more following her assessment, but only to request a written statement that she had not recommended additional treatment, which Gallegos declined to provide because she had, in fact, recommended Father undergo additional treatment.

{¶ 22} In May 2024, between his two dual assessments, Father participated in one therapy session via telehealth with Donna Johnson, a clinician at Harbor. He did not engage in any other therapy services while the case was pending other than when he contacted Johnson in September 2024 to ask for information about what a "rule out" diagnosis meant.

8.

{¶ 23} Indeed, although Father had been previously linked with the Family Child Abuse and Prevention Center for domestic violence victim services, Father had limited contact with that agency as well. An individual with the center wrote a letter, which was admitted at the hearing, stating that Father had been linked with them from June 2023 to June 2024, but Father "would only meet over the phone due to fear that people were breaking into his home." The letter further stated that "[f]rom June 2024 to December 2024 [Father] did not have any contact with [the center], but did call in December of 2024 to request court representation."

{¶ 24} Because Father failed to make any progress with his mental health, Rudebock did not link Father with any parenting education or other services. Rudebock did, however, conduct several home visits. She testified that even though the visits had been scheduled in advance, Father would rush through the visits and cut them short because he claimed that he did not have time to meet with her.

{¶ 25} During the visits, Rudebock observed several cameras throughout Father's residence, and she noted that the cameras seemed to change locations between visits. She also observed that Father's refrigerator was locked. Although Father explained that he locked the refrigerator to prevent his own binge eating, Rudebock observed that Father carried the key to the refrigerator on his person. Father also kept a knife block on his nightstand. Father explained that he had been doing dishes, and he had to move the knife block due to his kitchen's limited counter space. Rudebock observed, however, that there was open space on a dining room table that was closer to the kitchen counter than

Father's nightstand. She found all of these observations to be especially concerning considering Father's statements that people were coming into his home.

{¶ 26} Rudebock also testified that Father seemed fixated on Mother. Father told Rudebock that Mother was stalking him and showed Rudebock what he claimed was a picture of Mother outside his home. Rudebock testified that the picture showed a woman but the quality of the photo was too poor to determine the woman's identity. Rudebock saw no evidence to support Father's accusations of Mother stalking him during the pendency of the case, and she noted that she had never heard from Mother.

{¶ 27} Father also believed that Mother had a relationship with Howard, the LCCS caseworker who initially investigated the referral in this case. Father showed Rudebock a photo from Mother's Instagram account in which Mother was with a man whom the caption identifies as Mother's best friend. Father believed the man in the photo was Howard. Rudebock testified that although the man in the photo and Howard had some characteristics in common, such as wearing glasses, the man in the photo was not Howard. She also testified that she herself later found the photo on Mother's Instagram account and the photo's caption identified the man with a different name than Brandon Howard. Father told Rudebock that he believed Howard had moved to the Toledo area from California and got a job with LCCS so that he could cause Father to lose custody of J.J. Rudebock denied that Howard had any relationship with Mother.

10.

### Father's Testimony

**{¶ 28}** Father testified that he disagreed with his mental health diagnoses. He maintained that his only reason for needing counseling was due to the domestic violence perpetrated on him by Mother during their relationship, and he contended that he was diagnosed with an adjustment disorder because Harbor could not bill his insurance for domestic violence. Father contended that he was being stigmatized for his attempts to undergo treatment related to his domestic violence abuse. Father also denied the accuracy of the letter from Family Child Abuse and Prevention Center, stating that the claim he had not received any services between June 2024 and December 2024 was false.

**{¶ 29}** Father similarly denied having a delusional disorder. He stated that Rudebock had "tainted" his assessments from Harbor when she called Harbor to ask if LCCS's referral had been reviewed before his April 2024 dual assessment. Father claimed that Rudebock had a history of influencing evaluations at Harbor, and Father testified that he believed that Rudebock was acting in retaliation for complaints he made against her with LCCS. Father also maintained that the psychiatric assessment conducted by Gallegos was too short and not thorough enough to be accurate.

**{¶ 30}** When asked why he decided not to continue therapy if it could help him regain custody of his son, Father began speaking about Mother, testifying that she had attempted to burn down his house in Michigan.

**{¶ 31}** Father also testified about Howard, who he continued to allege was Mother's best friend. Father believed that Howard was working on behalf of Mother to

11.

ensure he lost custody of J.J. In support, Father provided the court with a printout of a Wikipedia page summarizing the plot of a movie in which a mother lost custody of her child and had a friend get a job at a child protective services agency to get the child back. Father believed that movie was Mother's inspiration.

{¶ 32} Father maintained that the allegations in the complaint were made up by Howard. He clarified that he never believed that someone was getting into his home through his son's tablet and instead he was concerned that someone might hack into his son's tablet.

{¶ 33} Likewise, Father testified that he had never said that people were coming into his home through the roof or the floor. Instead, he believed the building where he lived had been occupied by bootleggers during Prohibition and that it was possible that his unit contained secret passageways or hidden compartments, and that could be how people were getting into his home. He clarified that he was unsure whether it was Mother or someone else getting into his home, but he did believe that someone had been in his home.

{¶ 34} Father also testified that someone had gotten into his car and had sex in it. He believed that Mother was the person who did that because she had a spare key for his car. He testified that in the past, Mother had come into his home and sprayed her urine around so that he would know it was her.

{¶ 35} Father discussed the many ways that he had financially supported J.J. He noted that he worked with Ford for five years, he had been employed canvassing for a

12.

campaign, and he had recently signed an agreement to become an insurance agent. Father also presented evidence that he had purchased school supplies, winter gear, holiday gifts, and birthday party supplies for J.J.

{¶ 36} Father also stated that he had seen to J.J.'s medical care while J.J. was in his custody. Father provided a statement from a pediatrician from 2022 stating that J.J. was a patient of the practice as well as a referral from that pediatrician for an autism screening dated in January 2023. When asked why Father had not taken J.J. for the screening, Father explained that he had to reschedule the appointment. He claimed that he was unable to do so because LCCS took custody of J.J., but he could not explain why he could not reschedule the screening in the 13-month period between the date of the referral, January 2023, and the date that J.J. was removed from his custody, February 2024. Finally, Father testified that there had been an allegation that J.J.'s teeth had "bottle rot," and Father claimed that J.J.'s teeth were only discolored, not rotted, because J.J. drank chocolate almond milk due to lactose intolerance.

{¶ 37} Father also provided evidence that he had enrolled J.J. in an online school. When asked why he chose online school rather than in-person school, Father explained that he did so to protect J.J. because of Mother's stalking.

### Testimony regarding J.J.

{¶ 38} Rudebock testified that Father and J.J. are well-bonded and they clearly love each other. She confirmed that Father consistently attended his visits with J.J. at the agency and that he was moved from level one visits to level two visits while the case was

13.

pending. No one at the agency had any concerns about Father's visits with J.J., nor did J.J.'s foster parents or his guardian ad litem.

{¶ 39} At the beginning of his case, however, J.J., who was 5 years old, was not toilet trained. He had not yet been diagnosed with autism—though his pediatrician had written the referral for a screening more than a year before LCCS obtained temporary custody of J.J.—and he had not had any therapy or early intervention services. During his placement with his foster family, J.J. was toilet trained, attended kindergarten at an in-person school, participated in occupational therapy and was successfully discharged, and engaged in speech therapy. Rudebock testified that J.J. was initially reticent to play with the other children in his foster family but at her most recent visit with the family, J.J. played well and engaged with the other children.

{¶ 40} During his visits with J.J. at the agency, Father observed several bruises and other marks on J.J.'s face and body. He took photos of J.J.'s injuries and shared his concerns with the agency. Rudebock asked the foster family about the injuries, and they reported that J.J. had fallen off a swing and J.J. was being injured by another child in the foster family. The child who caused J.J.'s injuries was placed elsewhere shortly after that, and the problem was resolved. In addition, Father raised concerns with two drawings by J.J.—one involved a stick figure with X's over the figure's eyes and the second involved a person with a head on fire—and those drawings were given to J.J.'s counselor.

14.

{¶ 41} Both Rudebock and J.J.'s guardian ad litem testified that J.J. was well-cared for and well-bonded with his foster family, which was the same family with whom J.J. had been placed throughout the pendency of the case. Although J.J.'s foster family was unsure whether they would adopt J.J. if LCCS obtained permanent custody of him, they had committed to maintaining J.J.'s placement with them until LCCS was able to find a permanent placement for him.

### *Recommendation of J.J.'s Guardian Ad Litem*

{¶ 42} J.J.'s guardian ad litem recommended that the court grant permanent custody of J.J. to LCCS. The recommendation was based on how well J.J. had done in his foster placement—in addition to other improvements, J.J. had become much more social and rambunctious—and Father's lack of progress in addressing his mental health. J.J.'s guardian ad litem was concerned that Father's mental health would impede Father's ability to attend to J.J.'s needs and that J.J. would regress. According to J.J.'s guardian, Father's primary concern seemed to be Mother's actions rather than J.J.'s needs.

{¶ 43} Although his guardian attempted to ask J.J. who he wanted to live with, J.J.'s age and autism made communication difficult. J.J. expressed a desire to live with his foster family as well as with Father.

### C. The Juvenile Court's Judgment

{¶ 44} Following the permanent custody hearing, the juvenile court entered its judgment terminating Father's parental rights and awarding permanent custody of J.J. to LCCS and denying Father's motion to reunify. It found clearly and convincingly that J.J.

15.

could not be placed with Father within a reasonable time or should not be placed with him pursuant to R.C. 2151.414(B)(1)(a). The court also found that it would be in the best interest of J.J. to be placed in the permanent custody of LCCS and it would be against J.J.'s best interests to be reunited with Father.

{¶ 45} In rendering its decision, the juvenile court found several portions of Father's testimony not credible. Specifically, it determined that Father's accusations regarding the LCCS caseworkers, Father's testimony challenging the validity of his mental health diagnoses, and Father's explanation for failing to take J.J. to his autism screening were not credible.

{¶ 46} The court found that both R.C. 2151.414(E)(1) and R.C. 2151.414(E)(2) applied. As to R.C. 2151.414(E)(1), the court found that Father continued to deny his mental health diagnoses and refused to engage in the mental health treatment recommended to him. Accordingly, Father failed to make substantial progress in his case plan services and notwithstanding LCCS's reasonable case planning and diligent efforts, Father failed continuously and repeatedly to substantially remedy the conditions causing J.J. to be placed outside of his home.

{¶ 47} As to R.C. 2151.414(E)(2), the court held that Father suffered from chronic mental health issues—adjustment disorder and delusional disorder (rule out)—that were so severe that he could not provide an adequate permanent home for J.J., and Father's refusal to admit he suffered from mental health issues or to undergo treatment for those issues made it unlikely that he would remedy his condition within a year.

16.

{¶ 48} Finally, the court found that granting LCCS permanent custody was in J.J.'s best interest based on J.J.'s bond with his foster family, his only placement throughout this case; the progress that J.J. has achieved with his foster family; and his need for a legally secure permanent placement, which was unlikely to occur with his Father due to Father's failure to address his mental health issues.

### III. Assignments of Error

{¶ 49} Father filed a timely appeal and asserts the following assignments of error:

1. The trial court's decision to terminate father's custody of J.J. was not supported by clear and convincing evidence, pursuant to R.C. 2151.414(E)(1) and (E)(2).

2. The trial court abused its discretion by terminating father's parental rights when the Motion for Permanent Custody was filed less than one year after the removal of the child, such that time remained on the case, pursuant to R.C. 2151.415.

### IV. Analysis

**A. The juvenile court's decision terminating Father's parental rights is not against the manifest weight of the evidence.**

{¶ 50} Father's assignment of error challenges the juvenile court's decision to terminate his parental rights. "A juvenile court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re W.M.*, 2022-Ohio-1978, ¶ 41 (6th Dist.), quoting *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where [it is] determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice

17.

that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 51} "As the trier of fact, the juvenile court is in the best position to weigh the evidence and evaluate the testimony." *In re W.M.* at ¶ 42, citing *In re Brown*, 98 Ohio App.3d 337, 342 (3d Dist. 1994). "Thus, in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re S.S.* at ¶ 28, quoting *In re W.M.* at ¶ 42.

{¶ 52} Before terminating parental rights and awarding permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must first find both of the following: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) exists, and (2) permanent custody is in the child's best interests. R.C. 2151.414(B)(1). The juvenile court's findings must be supported by clear and convincing evidence, meaning the court must form a firm belief or conviction as to its findings. *In re T.J.*, 2021-Ohio-4085, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 53} Father contests the juvenile court's finding that R.C. 2151.414(B)(1)(a) applies, but Father presents no arguments regarding the juvenile court's finding that awarding permanent custody to LCCS is in J.J.'s best interest. R.C. 2151.414(B)(1)(a)

18.

provides that a juvenile court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, … and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

{¶ 54} Here, the juvenile court found that R.C. 2151.414(E)(1) applied. It states,

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 55} Notably, the juvenile court "only needed to find that one [R.C. 2151.414(E)] factor applied to support its holding." *In re C.F.*, 2007-Ohio-1104, ¶ 50; *In re Za.G.*, 2020-Ohio-405, ¶ 102 (6th Dist.).

{¶ 56} Father contends that the juvenile court's finding under R.C. 2151.414(E)(1) that J.J. could not be placed with him within a reasonable time is against the manifest

19.

weight of the evidence because he presented evidence to establish that he was capable of parenting J.J. and that there was no evidence to establish that J.J. was abused or neglected while in Father's custody. Father points specifically to evidence that he enrolled J.J. in school, he took J.J. to the doctor, and he was financially supporting J.J. Father further contends that his completion of a dual assessment and a psychiatric evaluation demonstrates that he addressed the issues that led to J.J.'s removal. He maintains that he did not have the mental health conditions with which he was diagnosed and therefore he did not need to take medication or undergo therapy.

{¶ 57} As a preliminary matter, Father's arguments that he provided an adequate home for J.J. while Father had custody of J.J. appear to be a challenge to the juvenile court's finding that J.J. was a dependent child. However, Father's failure to appeal the finding makes the juvenile court's dependency finding "the law of the case," and this court lacks jurisdiction to consider that finding. *In re C.R.*, 2021-Ohio-1969, ¶ 29 (6th Dist.). Accordingly, Father cannot now challenge the existence of conditions—here, that Father's mental health impeded him from providing an adequate home for J.J.— that caused J.J. to be placed outside his home.

{¶ 58} Moreover, there was competent, credible evidence to support the juvenile court's finding that Father "failed continuously and repeatedly to substantially remedy the conditions causing [J.J.] to be placed outside [J.J.'s] home." Gallegos testified regarding Father's mental health diagnoses and Father's refusal to undergo treatment for those diagnoses. Other than his own denial, Father presented no evidence to contest these

20.

diagnoses.  LCCS also presented evidence that Father engaged in limited treatment with Family Child Abuse and Prevention Center to assist him in recovering from domestic violence.

{¶ 59} Although Father clearly loves J.J. and the two are very bonded to each other, Father suffered from mental health conditions that caused him to focus his attention on Mother's alleged actions rather than addressing J.J.'s developmental needs. Father then refused to take the steps necessary to regain custody of J.J. by seeking treatment for these conditions, and instead he focused his attention on finding conspiracies among the caseworkers and mental health providers tasked with assisting him reunite with J.J.  Indeed, Father devoted large portions of his testimony at the hearing describing these conspiracies all while denying that he had any mental health condition.

{¶ 60} Accordingly, the juvenile court's finding under R.C. 2151.414(E)(1) that Father failed continuously and repeatedly to substantially remedy the conditions causing J.J. to be placed outside his home is not against the manifest weight of the evidence. Because a trial court need only make a finding of one factor under R.C. 2151.414(E), Father's arguments regarding the trial court's finding under R.C. 2151.414(E)(2) need not be addressed.

{¶ 61} Father's first assignment of error is not well-taken.

**B. The juvenile court did not abuse its discretion in failing to extend LCCS's temporary custody of J.J.**

21.

{¶ 62} In support of his second assignment of error, Father argues that the juvenile court abused its discretion in granting LCCS's motion for permanent custody because it was filed less than one year from the date when J.J. was removed from Father's custody. Father cites R.C. 2151.415(D)(4), which governs the number of times that a juvenile court may extend an agency's temporary custody of a child.

{¶ 63} But as LCCS points out, there was no motion before the juvenile court to extend LCCS's temporary custody. Instead, the only motions before the juvenile court in this case were LCCS's motion for permanent custody and Father's motion to reunify.

{¶ 64} Moreover, R.C. 2151.415(D) provides that a juvenile court may—not must—extend a temporary custody order if it determines, by clear and convincing evidence, that there has been significant progress on the case plan, among other things. Indeed, a "juvenile court is not required to prolong the custody proceedings for a parent to begin to cooperate in the case planning process." *In re May.R.*, 2019-Ohio-3601, ¶ 30 (6th Dist.), citing *In re A.A.*, 2017-Ohio-8705, ¶ 37 (6th Dist.).

{¶ 65} Here, as already discussed, Father refused treatment for his mental health conditions as required by his case plan. Therefore, Father had not made significant progress on the case plan and at least one condition required for the juvenile court to extend temporary custody under R.C. 2151.415(D) was not satisfied. Even if a motion to extend temporary custody had been pending, the juvenile court was not required to prolong the proceedings in the hope that Father would begin to cooperate with the case

22.

plan. The juvenile court did not abuse its discretion in failing to extend LCCS's temporary custody.

{¶ 66} Accordingly, Father's second assignment of error is not well-taken.

### V. Conclusion

{¶ 67} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See, also,* 6th Dist.Loc.App.R. 4.

| | |
|---|---|
| Gene A. Zmuda, J. | [[Applied Signature]] |
| | JUDGE |
| Myron C. Duhart, J. | [[Applied Signature 2]] |
| | JUDGE |
| Charles E. Sulek, P.J. | [[Applied Signature 3]] |
| CONCUR | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.